## MERCOID CORPORATION v. MINNEAPOLIS–HONEYWELL REGULATOR CO.

### No. 1839.

District Court, N. D. Illinois, E. D.

Feb. 27, 1942.

Langdon Moore and L. Kerans Moore, both of Chicago, Ill., for Mercoid Corp.

Bair & Freeman, of Chicago, Ill., for Minneapolis-Honeywell.

BARNES, District Judge.

On June 29, 1940, the Mercoid Corporation, a corporation of Delaware, having a principal place of business and factory in the city of Chicago, Illinois (hereinafter referred to as "Mercoid"), filed its com-

plaint for a declaratory decree against Minneapolis-Honeywell Regulator Company, a corporation of Delaware, licensed to do business in the state of Illinois (hereinafter referred to as "Minneapolis-Honeywell"). Subsequently, Mercoid filed its supplemental complaint against Minneapolis-Honeywell. By its complaint and supplemental complaint, Mercoid sought a decree adjudging that its devices, known as fan and limit controls, do not infringe or contribute to the infringement of Minneapolis-Honeywell's Freeman Patent No. 1,813,732, adjudging that said patent is invalid, and adjudging that Minneapolis-Honeywell has granted licenses to others to set up a monopoly beyond the scope of said patent, in restraint of trade and in violation of the anti-trust laws of the United States.

By its answer, Minneapolis-Honeywell alleged that the Mercoid fan and limits control is so constructed and arranged as to carry out the teachings and invention of Freeman Patent No. 1,813,732, that said device infringes said patent, and that said patent is valid, and it admits that it has granted licenses under said patent to certain named licensees, but it denies that it has granted licenses which broaden or tend to broaden the scope of said patent.

On July 1, 1940, Minneapolis-Honeywell filed a complaint against Mercoid, wherein it charged infringement by Mercoid of said Freeman Patent No. 1,813,732. Mercoid answered, and by its answer denied infringement, denied validity of the patent, alleged that Minneapolis-Honeywell has been guilty of laches and is utilizing said patent to establish a monopoly in the sale of a combination furnace control per se not coming within the boundaries of the Freeman patent.

The cases were consolidated and tried together.

Freeman Patent No. 1,813,732 was issued July 7, 1931, on an application filed January 16, 1931. In this patent, it is said:

"This invention relates to control apparatus, principally for use with a hot air furnace.

"The principal object of the invention is to provide a control for the rate of combustion and for the operation of an accelerating device, such as a fan, blower or similar apparatus, used for accelerating the rate of supply of the heat-conducting medium, such as air, to be heated by the furnace, said control being such as to permit the operation of said accelerating device and to check combustion in case the furnace becomes overheated and such as to interrupt the operation of said accelerating device while increasing the rate of combustion if the furnace has not been heated above a predetermined temperature.

"In addition, a control feature is added by means of which both the combustion and the supply of the heat-conducting medium are checked when the temperature of the room or object to be heated is above a predetermined degree."

As applied to a hot air furnace fired by a coal stoker, the system disclosed by the patent includes three thermostats, one in the room or space to be heated operated by changes in the temperature in said room or space and two in the hood of the furnace operated by changes in the temperature of the air in said hood. One of these last mentioned thermostats opens and closes a circuit passing through the motor which drives the coal stoker, and the other thermostat in the hood opens and closes the circuit which passes through the motor which drives a fan in the cold air supply to the furnace.

The patent contains ten claims. Claims 1, 2, 3, 6, 7 and 8 omit reference to the room thermostat. Claims 4, 5, 9 and 10 include references to three thermostats. Minneapolis-Honeywell relies upon Claims 1, 4, 6 and 9. They are as follows:

"1. In a furnace control, the combination of apparatus for controlling the rate of combustion and the rate of supply of a heat-conducting medium, thermostatic apparatus responsive to furnace temperature, and connections between said control apparatus and said thermostatic apparatus by means of which said control apparatus operates to check combustion while supplying said medium when furnace temperature exceeds a predetermined degree.

"4. In a furnace control, the combination of apparatus for controlling the rate of combustion and the rate of supply of a heat-conducting medium, thermostatic apparatus responsive to furnace temperature, connections between said control apparatus and said thermostatic apparatus by means of which said control apparatus operates to check combustion while supplying said medium when furnace temperature exceeds a predetermined degree, other thermostatic apparatus responsive to the temperature of the object to be heated, and connections between said control apparatus and said last-mentioned thermostatic apparatus by means

880

of which said control apparatus operates to check both combustion and the supply of said medium when said object is above a predetermined temperature irrespective of the furnace temperature.

"6. In a furnace control, the combination of an electrically-operated combustion control apparatus adapted to accelerate combustion when supplied with electric power and to check combustion when not so supplied, a motor-driven fan for controlling the supply of air to be heated, a source of electric power, electric circuits for connecting said power source to said control apparatus and the motor of said fan, and thermostatic apparatus interposed in said circuits, responsive to furnace temperature and adapted to interrupt the circuit to said combustion control apparatus while completing the circuit to the motor of said fan when furnace temperature is above a predetermined degree.

"9. In a furnace control, the combination of an electrically-operated combustion control apparatus adapted to accelerate combustion when supplied with electric power and to check combustion when not so supplied, a motor-driven fan for controlling the supply of air to be heated, a source of electric power, electric circuits for connecting said power source to said control apparatus and the motor of said fan, thermostatic apparatus interposed in said circuits, responsive to furnace temperature and adapted to interrupt the circuit to said combustion control apparatus while completing the circuit to the motor of said fan when furnace temperature is above a predetermined degree, and other thermostatic apparatus interposed in said circuits in series connected with said first-mentioned thermostatic apparatus, responsive to the temperature of the space to be heated and adapted to interrupt the circuits to both said combustion control apparatus and to the motor of said fan when said last-mentioned temperature is above a predetermined value."

As against the validity of the Freeman patent, Mercoid cites Teal Patent No. 1,067,-627. The Teal patent discloses no fan or thermostat in the furnace hood controlling a fan. In this respect it is like Johnson Patent No. 1,602,363, Mercoid Bulletin D of April 1, 1924, Mercoid Catalog H-3 of 1928, page 28, and Oil-O-Matic Drawing A-150 of December 24, 1925, which were also cited by Mercoid. Mercoid also cited Wiring Diagram No. 740, on page 31 of its

catalog No. G-5 of 1929, Revised Edition. This disclosed the same sort of a control as Teal. Mercoid also cited Edgecombe Reissue Patent No. 15,531. Edgecombe differs from Freeman in that it has two room thermostats instead of a one room thermostat, and has no limit switch in the furnace hood. Mercoid also cited Cross Patent No. 1,758,146. Cross differs from Freeman in that it has neither a fan thermostat nor a limit thermostat in the furnace hood. Mercoid also cited Illustration No. 4 in its Bulletin A-5 of June, 1930. Illustration No. 4 merely discloses a portion of the disclosure of the Edgecombe Patent. Specifically, there is no disclosure of a limit switch or a combustion motor. Mercoid also cited Mercoid Drawing No. 266 of September 27, 1927. This disclosure differs from that of Freeman in that in Drawing No. 266 the limit switch is cut into the circuit ahead of the room thermostat, which, of course, makes an entirely different sequence of operation. Mercoid also cited Drawing No. 748 in its Catalog No. H-5 of 1929, Revised Edition. Drawing No. 748 also sets the limit switch ahead of the room thermostat, thereby making a sequence of operation entirely different from that of Freeman. Neither Mercoid Drawing No. 266 of September 27, 1927, nor Drawing No. 748 of Mercoid Catalog No. H-5 of 1929 shows a limit switch between the room thermostat and the combustion motor, as does Freeman.

Mercoid also set up several prior uses—that of Portner at Wheaton, Illinois, and those of the Evangelical Church and Ned Dolan at Bloomington, Illinois. It is clear that Portner is now using a system of furnace control which closely approaches that of the patent in suit, though it is a fact that it differs in one particular. The court is not satisfied, however, that it was installed as it now exists prior to the Freeman date of application. The same thing is true of the Evangelical Church and Ned Dolan prior uses. They differ somewhat from Freeman disclosure in at least one particular, but their great defect is that the court is not satisfied that they were installed in their present condition prior to the Freeman critical date.

The court is of the opinion that the Freeman patent discloses invention over the prior art and that it is valid.

Referring to the defense of laches, the court is of the opinion that there are no elements of estoppel involved and that the

mere delay which has taken place does not constitute a defense.

■ On the charge that Minneapolis-Honeywell has been using its patent on the Freeman system of furnace control as a means of creating or attempting to create a monopoly on an unpatented device, contrary to the rule laid down in the Morton Salt case, Morton Salt Co. v. G. S. Suppiger Co., 62 S.Ct. 402, 86 L.Ed. ——, and those somewhat similar cases which preceded but perhaps do not go quite as far as the Morton Salt case, the court is of the opinion that it must be held that Minneapolis-Honeywell has been so using its patent as to tend to create a monopoly in an unpatented device. Minneapolis-Honeywell has been licensing others and has offered to license Mercoid to manufacture, use and sell a single device which embodies within itself two elements of the Freeman patent, namely, the two thermostats which are placed in the furnace hood, one being the fan switch and the other being the limit switch. This device, embodying these two elements, is said to be a patented device, but the patent is owned by some person other than Minneapolis-Honeywell and Mercoid, so as to them and so far as this case is concerned it is an unpatented device. The Freeman patent is not a patent on either the fan switch or the limit switch or both of them. It is a patent on a system of furnace control, which requires three thermostats for its operation. It happens that two of those thermostats are a fan switch and a limit switch.

The court is of the opinion that it follows, from what has been said, that both complaints, that of Mercoid and that of Minneapolis-Honeywell, must be dismissed for want of equity.

■ The court is of the opinion that it will be equitable to divide the costs, and that shall be done.

Counsel for each side may prepare and, within seven days from this date, present drafts of findings of fact, conclusions of law, and a decree not inconsistent with the views hereinabove expressed. Counsel may, within 14 days from this date, present, in writing, such, if any, observations in respect of or exceptions to the drafts presented on behalf of the other side as he may deem necessary or desirable. This having been done, the matter of making findings of fact, conclusions of law, and a decree will be taken by the court without further oral argument.

Counsel may take and keep, subject to the order of the court, the exhibits of their respective clients.